TERRITORY OF HAWAII *v.* ARCENIO ABELLANA.

Nos. 2659 AND 2660.

ARGUED MAY 8, 1950. DECIDED MAY 25, 1950.

KEMP, C. J., LE BARON AND TOWSE, JJ.

OPINION OF THE COURT BY TOWSE, J.

Writs of error issued to review the judgments of conviction of the crimes of rape and robbery in the first

degree. The defendant consented to consolidation of the indictments for trial by jury, and by stipulation in this court consented that the proceedings on review be had jointly. The writs are directed to identical assignments in each case.

Substantial evidence was adduced at trial upon which the jury returned a verdict of guilty as charged under each indictment; and, as they pertain to the errors assigned are these: The victim of the rape, a fifty-three-year-old woman, in company with the victim of the robbery, an enlisted member of the United States Army, were walking ewa on the makai sidewalk of South King street in the vicinity of the entrance to the Catholic cemetery at about 6:30 o'clock p. m. Without warning both were confronted by two individuals unknown to them, one in military uniform later identified as Angelino P. Pacheco, Private First Class, United States Army, the other in civilian attire later identified as the defendant-plaintiff in error, hereinafter referred to as the defendant. Pacheco seized Jones' arm, leveled a .45 calibre United States Army automatic revolver at him and ordered him to proceed into the cemetery, the defendant simultaneously seizing Jones' female companion by the arm and also impelling her by force into the cemetery. At a *locus criminis* toward the rear of the cemetery Pacheco forced Jones, at the point of the weapon, to hand over to him the sum of three dollars cash together with his wallet. While this ensued, the defendant by force and against the will of the victim consummated the crime of rape. In doing so he forcibly tore and removed certain of her clothing, and inflicted bodily injuries by way of abrasions to the left upper thigh, scratches upon the left buttock, a blackened right eye, hematoma of the left check, contusions of the lips and loss of a tooth. The foregoing was established

534

at trial by exhibits of the victim's false tooth, soiled white blouse together with one detached button, a torn and soiled white slip, a soiled white skirt, and a soiled undergarment. The defendant consummated his assault and ravishing of the victim within several feet and hearing distance of her helpless escort who could render no aid nor resist the duo as he lay prone and motionless guarded at the point of the weapon by Pacheco.

Upon consummation of rape, the defendant reversed roles with Pacheco, the weapon being passed from Pacheco to the defendant during the transposition. The defendant continued vigilance over Jones while Pacheco, by force and against the will of the victim, also raped her. Pacheco also by force, appropriated her purse containing four dollars. The victim eventually succeeded in escaping and fled toward the King street entrance of the cemetery, Pacheco in the interim terminating his guard over Jones. Together they followed the victim to the entrance again seizing her arm and menacing her at the point of the weapon demanding that she proceed to Thomas square for further illicit purposes. The victim resisted these subsequent advances to the best of her physical ability under the circumstances, and succeeded in attracting the attention of a passing motorist. Pacheco thereupon reconcealed the weapon upon his person and both terminated their advances and withdrew. The motorist transported the victim to Waikiki where she reported the assault. Jones, upon being released, also reported the attack and robbery.

The pair then boarded a Waikiki bound bus disembarking in the vicinity of Fort De Russy and proceeded to 413-A Seaside avenue, the residence of one Miss Adelaide Rodrigues, arriving at approximately 8:00 o'clock p. m. Miss Rodrigues, at the time of their entry upon the premises, was about to enter her automobile when she detected

Pacheco and the defendant standing in the rear of the vehicle. She inquired of their mission, in reply to which the defendant stated that they had come to rob and steal. Pacheco seized Miss Rodrigues' arm and forced her to walk approximately twenty-five feet from the garage with him during which time he pointed the weapon at her back and warned her to remain silent. A neighbor reported the incident to the police, Pacheco and the defendant thereupon withdrawing. They were apprehended at approximately 8:30 o'clock p. m. on Ala Wai boulevard after pursuit and an ensuing struggle, Pacheco, at the time, having possession of the weapon. Further details of the evidence, pertaining to the defendant and the joint use of the weapon are set forth hereafter as they become pertinent to consideration of the assigned errors.

Charges preferred against Pacheco were transferred to the military authorities for disposition leaving the defendant, as a deemed principal, to be tried under separate indictments for rape and robbery in the first degree in the circuit court.

Five errors are assigned which will be specified and considered *seriatim*. Assigned errors numbered I and II will be considered concurrently.

I. "At the trial, one Adelaide Rodrigues * * * gave testimony of acts, circumstancs and things alleged to have occurred about two hours after the time of the alleged crime of rape and robbery * * * and about two miles away from the locale of the said alleged crime of rape and robbery, which testimony was offered by the Territory for two purposes, *viz.*: (1) To show that 'these two men had a plan that night to rape and rob', and that such plan was 'continuous', and (2) to indentify and thereby connect the accused with the commission of the alleged crime of rape and robbery as charged—to all of which testimony

* * * said Defendant, Plaintiff in Error, objected upon the ground that it was immaterial and prejudicial * * *."

II. "The Court erred in overruling the defendant's motion to strike the testimony of the said witness Adelaide Rodrigues * * * upon the ground of prejudice to the Defendant * * *."

The pertinent portions of the testimony of Adelaide Rodrigues, called as a witness on behalf of the Territory, established that on the night in question between 8:15 o'clock p. m. and 8:20 o'clock p. m. at her residence at 413-A Seaside avenue, as she was about to enter her automobile in her garage, she saw Pacheco and the defendant standing at the rear of the vehicle looking into her apartment. She inquired whether they were looking for someone, the defendant replying that "they had come there to rob and steal, and 'What are you going to do about it' "? The witness repeated her inquiry, the defendant replying that they were looking for an individual named Price, Miss Rodrigues replying that he (Price) did not reside there. Pacheco thereupon "grabbed me by my left arm and I walked along with him for about twenty-five feet, and he stuck this revolver in my back and told me I wasn't going to talk about it * * *."

Error is urged upon the ground that the testimony disclosed that the defendant had committed another crime wholly independent of, and unconnected with that for which he was tried; that the testimony was irrelevant and inadmissible in that it did not tend to establish the commission by the defendant of the crimes laid in the indictment; that the defendant being triable for but one offense at a time, evidence thereof must be confined to the issues created under the instant indictments, evidence of other crimes thus compelling him to meet charges of which the indictments give him no information, confuses his

defense, raising a variety of issues, and resultingly diverts the attention of the jury from the issues immediately before it, all to his prejudice.

To the established rule that evidence of other crimes wholly independent of that for which a defendant is on trial is inadmissible, are two equally well-defined exceptions: (1) That evidence of other crimes is competent to prove the specific crime charged if it tends to establish a common scheme, plan or system embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; and (2) when such evidence tends to aid in identifying the accused where his identity has not been definitely connected with the offense on trial.

"While the rule itself is fundamental and well settled by a long line of adjudication, it is equally fundamental and well settled that in certain classes of cases collateral offenses may be shown as reflecting upon the mental processes * * * of the accused * * * where such collateral offenses have been executed according to a plan or method * * *." *Whiteman* v. *State*, 119 Ohio 285, 290, 164 N. E. 51, 52.

"But the general rule is salutary, and departure from it is perilous, and hence courts are reluctant to extend the exception to the rule beyond well established lines. While the decisions of different jurisdictions vary somewhat as to the application of this exception to the rule, yet they are all in substantial accord upon the proposition that unless there be some apparent logical connection between the two offenses, either by reason of both being of the *res gestae,* or both being part of one system, or the one tending to show a *scienter* in the other, the general rule governs, and the exception to it does not apply." *Towne* v. *The People,* 89 Ill. App. 258, 283.

To determine whether or not either or both of the exceptions are applicable, evaluation must be made of the evidence developed at trial to ascertain if proof of the independent offenses as testified to by the witness Rodrigues is of such a correlative nature as to be considered competent proof within the issues framed under the indictments for rape and robbery in the first degree. The evidence established that the defendant and Pacheco rendezvoused at a beer parlor on King street from 2:00 o'clock p. m. to 6:00 o'clock p. m. on the afternoon of the commission of the crimes, both drinking freely. They then proceeded to Pacheco's home near Thomas square, where Pacheco obtained the weapon, and immediately left intending to board a bus presumably to Waikiki. On King street they first observed the victim and Jones walking in an ewa direction on the makai sidewalk of King street near the entrance of the cemetery, and Pacheco suggested, "let's go in and hold them up." The defendant concurred. Pacheco thereupon seized Jones' arm, drew the weapon, leveled it at Jones, and ordered him to proceed into the cemetery where, in the rear portion thereof some distance from the street and at the point of the weapon, he took from Jones the sum of three dollars and his wallet. Later in further manipulations with the weapon, as Jones was lying prostrate being guarded by Pacheco, and while the defendant attacked and raped the victim, Pacheco "clicked" the gun sliding it down to Jones' temple. Pacheco also robbed the victim of four dollars. Following the *crimen raptus* and *crimen roberiae* in the cemetery and while the victim was attempting to attract the attention of passing motorists in her endeavor to escape, Pacheco further menaced her with the weapon, the defendant simultaneously attempting to coax and drag the victim to Thomas square. They then departed from the vicinity and consummated their original

plan of journeying to Waikiki by boarding a bus.

Juxtaposing these facts with the testimony of the witness Rodrigues, a common plan, scheme and system predicated in part upon the use of the automatic weapon as the focal operative instrumentality employed, and lending a continuity of lawless means throughout their evening's pursuits is apparent. To the witness Rodrigues' inquiry, the defendant replied "they had come there to rob and steal * * *." Pacheco seized her arm and walked with her brandishing the weapon at her back. The defendant's statement: "What are you going to do about it"? further connotes *scienter* of an expressed, preconceived, designed continuity of a lawless agenda employing and necessitating the identical use of force and arms as was theretofore employed at the cemetery.

Their admitted intention in proceeding to King street from Pacheco's home was to "catch the bus." Under the evidence, this predetermination lends to the inference and resulting conclusion that the crimes committed within the cemetery were of an intervening, extemporaneous, impromptu nature, and were in fact collaterally conceived and related to the principal purpose of boarding a bus presumably for Waikiki. The intervening crimes committed within the cemetery were, however, converted into the primary crimes of a preconceived evening's undertaking of lawlessness employing the weapon and clip with four cartridges as a *modus operandi* in its development by preliminarily placing victims and potential victims in preludial fright or submission. These means, employed within a radius of two miles and within one hour each of the other, disclose a common plan, scheme and system embracing and collateral to the subsequent crimes testified to by the witness Rodrigues, thereby concentralizing them within the orbit of the evening's criminalisms. The

Rodrigues testimony thus guides the subsequent acts, circumstances and crimes within the relevant scope of the issues framed under the indictments.

"Whatever testimony tends directly to show the defendant guilty of the crime charged is competent although it also tends to show him guilty of another and distinct offense. A party cannot, by multiplying his crime, diminish the volume of competent testimony against him." *The People* v. *Horn*, 309 Ill. 23, 25, 26, 140 N. E. 16, 17.

That the defendant had possession of and used a weapon was in issue, and evidence of this fact is admissible though it tends to prove the defendant committed another crime. (See *People* v. *Bingham*, 44 Cal. App. [2d] 667, 112 P. [2d] 941, 942.)

"Thus the evidence of the collateral crime was properly admitted * * *. That the collateral crime was committed after the commission of the offense for which defendant was on trial does not in itself furnish sufficient reason for rejection of the evidence concerning it." *People* v. *Webster*, 79 Cal. App. (2d) 321, 327, 179 P. (2d) 633, 636.

Defendant contends that the second exception is likewise inapplicable for the reason that the identity of the accused was definitely connected under the issues raised upon trial and was established by independent evidence. The record contains no stipulation or admission of identity of the accused as the perpetrator of the crimes charged in the indictments. The defendant was on trial under the issues framed by his pleas of not guilty under two separate indictments consolidated for trial for the alleged commission of two "acts or transactions connected together," robbery in the first degree of Jones and rape of the victim. The burden of proof thus evolved was upon the territory and continued throughout the trial. The evidence bears positive identity of her assailant by the victim on the one

hand, but indefiniteness on the other hand as to whether the witness Jones established the identity of the defendant other than referring to him as the civilian, and his further statement that "I never saw the civilian in the face at all."

The burden of proof upon the issue of identity being upon the Territory throughout, the testimony of the witness Rodrigues was competent and relevant upon that issue also. (See *People v. Horn, supra.*)

No merit attaches to either of the foregoing specified errors.

III. "The Court erred in admitting in evidence over the objection of the Defendant * * * two photographs marked Territory's Exhibit 'A' and Exhibit 'B', respectively, purporting to show and offered by the Territory to show the scenes of the alleged crime, the Defendant * * * having made objection to their admission upon the ground that it was highly prejudicial and * * * 'there was no necessity of having the complainant in the picture at all' * * *."

Each of the exhibits are eight by ten inches enlarged photographic prints depicting the scene of the crimes taken approximately six hours thereafter. Exhibit "A" illustrates a foreground of grave markers, a background of brush and shrubbery through which the victim of the rape was dragged, a package which she dropped in the struggle, and the victim standing in the right center of the scene pointing with raised arm to the background. Over the right eye of the victim is a bandage. The exhibit is sufficiently clear in detail that contusions of her lips and nose, and trauma of the left upper cheek are discernible. Exhibit "B" illustrates the locale of the rape, the victim being included therein standing in the left center of the scene pointing with raised arm to the foreground. As in Exhibit "A", her injuries are also discernible.

The admission of the exhibits is assigned as error upon the grounds that they are prejudicial in nature; that the inclusion of the victim in the photographs was unnecessary; that the photographs possess no probative value nor are they instructive or substantially necessary as evidence.

Neither photograph reproduces any matters, things or objects of an inherently gruesome or shocking nature either in respect of the victim or of the included surroundings. They exemplify the natural environs of the scene and are possessed of probative value under the issues framed by the indictments. Morever, the act of intercourse *per se* is not denied by the defendant nor is it contended that the photographs do not correctly reproduce the *locus in quo*.

"No prejudicial error was committed in the introduction of the photographs, as the acts of intercourse are admitted, and there is no controversy about the place. Nor is it contended that the photographs do not correctly reproduce the *locus in quo*. They reproduced the scene of the alleged crime and may have had some probative value on the question of consent. The jury might or might not have regarded the place as one which would likely be voluntarily selected for assignation purposes." *Zinn and Cheney* v. *State,* 135 Ark. 342, 350, 205 S. W. 706.

Defendant contends that inclusion of the victim in the exhibits was not necessary. Conceivably this contention might be tenable if the scene of the crime were a sharply controverted issue. It is not, however, controverted nor in issue. The exhibits are relevant as a reproduction of the *locus in quo* laid in the indictments. Photographs representing an animate victim at the scene of a crime are relevant for the purpose of identity, even though there is no actual issue thereof.

"The photograph, when thus authenticated, was ad-

missible in evidence for the purpose of identifying the body as being that of * * *. This rule's observance is not affected, one way or the other, by the fact that there is in the evidence given by the witness or witnesses no actual dispute as to the identity of the body * * *." *Sanders* v. *State,* 202 Ala. 37, 38, 79 So. 375, 376.

The victim testified in elaborative detail as to the nature and extent of the injuries inflicted upon her person. The physician who attended her at the emergency hospital also testified as to the nature and extent of her injuries. The photographic evidence of the nature and extent of the victim's injuries after medication was thus relegated into a cumulative category of competent evidence.

"The condition of the body as shown by these photographs in these various positions, had been testified to by the officers and other witnesses sworn in the case * * *. They simply portrayed facts which the jury were entitled to have brought to their knowledge and, if they impressed the jury more strongly than the narration of these facts by sworn witnesses, no harm in a legal sense was sustained by the appellant, and their admission in evidence cannot be held to be error." *People* v. *Shaver,* 7 Cal. (2d) 586, 591, 592, 61 P. (2d) 1170, 1173.

The record further supports the conclusion that neither of the exhibits was offered for the calculated purpose, as asserted, of prejudicing or inflaming the minds of the jurors against the defendant, nor could their introduction have caused that effect when considered with all of the evidence adduced.

The admission or rejection of the photographs rested within the sound discretion of the court, and upon the record we find no abuse of that discretion.

The error assigned is without merit.

IV. "The Court erred in giving the following instruc-

tion to the Jury: 'The Court further instructs you, Gentlemen of the Jury, that if you find from the evidence in these cases beyond a reasonable doubt that the defense set up by the defendant is a false and fabricated defense, and was purposely and intentionally invoked by the said defendant then you are instructed that such a false and fabricated defense forms the basis of a presumption against him because the law says that he who resorts to perjury to accomplish an end, this operates against him and you may take such action as the basis of a presumption of guilt. However, you are the sole judges of the credibility of the witnesses and the weight to be given to their evidence'."

Substantially the identical instruction is found in *Territory* v. *Truslow,* 27 Haw. 109, wherein this court reviewed, approved and established the rule of law measuring the credibility of a defendant-witness where the testimony under the facts and circumstances in evidence warrant its application. Its utilization is, however, strictly limited to trials wherein the testimony of the defendant, by way of defense to the crime, mandates admeasurement by a postfixed rule of credibility which the collective facts and circumstances of the summated evidence compels. A determination of its applicability necessitates a review of the pertinent portions of the defendant's testimony as the sole witness in his behalf, and of Territory's exhibit "M", his statement.

The material contents of exhibit "M", *seriatim* therefrom are: That the defendant had known Pacheco for three or four years; that he met Pacheco on September 22, 1946, in the forenoon of the day in question between 10:30 o'clock a. m. and 11:00 o'clock a. m.; that after having lunch and at about 2:00 o'clock p. m., they proceeded to a beer parlor on King street where they remained until

5:00 o'clock or 6:00 o'clock p. m., drinking beer during that time, and then walking to Pacheco's home nearby, procuring a .45 calibre army automatic revolver, and thence proceeding to King street to board a bus; that they saw a soldier and a woman enter the cemetery; that Pacheco suggested, "Let's go in and hold them up," assuring the defendant that he was capable of handling the weapon; that on entering the cemetery they approached the soldier and the woman "side by side from the front"; that as they so approached, Pacheco "snapped back" the weapon which he held in his hand; that Pacheco held up the soldier and told the defendant "to take care of the woman"; Pacheco "told me to rape her"; that after he had consummated this Pacheco handed the defendant the weapon which he then held facing Jones while Pacheco "used the woman"; that Pacheco told the soldier "to lie down on the ground"; that the defendant told the woman "to lie down too"; that the woman lay down and the defendant had sexual intercourse with her; that at no time did the defendant strike or punch her; that at no time did he threaten her; that he did not forcibly remove her undergarments; that he did not scratch any part of her person; that she voluntarily and in all respects co-operated and assisted him in consummating a mutually reciprocal act of sexual intercourse; that she at no time struggled or tried to resist him; that she did not scream or cry out at any time; that upon completion, Pacheco handed him the gun and ordered him to stand guard over the soldier; that he ordered Jones to put his face toward the left side of his shoulders and to remain silent; that the defendant did not threaten either Jones or the woman at the time Pacheco was engaging her; that later as they walked toward King street from the *locus criminis* the woman stated she would bring them "some more women so we

could go with them"; that they then walked out of the cemetery with the victim to King street, boarded a bus and proceeded to Waikiki where they stopped in a yard where a woman approached them; that the woman grabbed Pacheco by the arm and that Pacheco shoved her.

The defendant on direct examination testified that on the day in question and in company with Pacheco he saw the complaining witness and Sergeant Jones near the cemetery; that they had just come from Pacheco's home and were walking toward town on King street across from the cemetery when Pacheco told him to "duck in the yard"; that after a while Pacheco told him to go across the street with him and that they thereupon entered the cemetery and were walking through a "bunch of trees" where the victim and Jones were; that the victim was twelve to fifteen feet away from Jones; that he and Pacheco approached Sergeant Jones and also the victim and asked "what she was doing in there"; that the victim looked like she had just gotten up or she was looking for something; that he inquired "what she was doing in there" and "if she came in there to have intercourse with the soldier," which she denied; that he then suggested intercourse with her and that she replied "all right"; that she thereupon voluntarily consummated sexual intercourse with him and assisted him in all respects; that thereafter Pacheco approached him and gave him the weapon and that he went over to Jones who was "lying down on the ground"; that he only went near Jones but did not "face the gun on him" but "faced it away from him"; that when Pacheco upon consummation was walking out with the victim the defendant inquired where they were going to which Pacheco replied that the victim was "going to get two more girls for us"; that he had returned the gun to Pacheco as Pacheco was returning to the King street

entrance with the victim; that he at no time beat or punched the victim; that she did not "resist, scream, kick, bite me, or try to push me away"; that the victim had sexual intercourse with him willingly; that he did not know "at any time" that Pacheco had robbed Jones of any money.

Upon cross examination: That at the time he and Pacheco entered the cemetery he did not know Pacheco had a gun. The defendant was accorded opportunity to reconcile prior inconsistent statments, *viz.*: that he and Pacheco were not at any time in the vicinity of the cemetery on the day in question; that previous to seeing the victim at the police station he had not seen her at any time on the day in question; that he had not seen Jones at any time previous to seeing him at the police station in the early morning of September 23, all of which prior inconsistent statements the defendant failed to reconcile or explain in any degree commensurate with reasonable conformance. The defendant further denied that he had stated to the witness Rodrigues that he and Pacheco were "out there to rob."

No more appropriate characterization of the foregoing defense in the light of the facts and circumstances of record, purposely and intentionally invoked and calculated to deceive and mislead the jury in an attempt to make the false appear to be true can be cited than as expressed in the *Truslow* case, *supra*:

"If true it would have been an absolutely good defense. The jury by its verdict stamped it as false. The defense was the product of the defendant. Its sole support was in the evidence of the defendant. This is not a case of mere conflict in the evidence."

The evidence, the exhibits and the facts and circumstances established of record also meet the prerequisite

attaching to the application of the rule:

"But, to justify the application of this principle, there must be some proof of it, or testimony of facts or circumstances, tending to support such inference. Mere conflict among witnesses examined on the opposing side, without more, does not and can not raise such inquiry, or bring the principle referred to into play." *Territory* v. *Truslow, supra.*

Cumulative of the foregoing are the following exhibits: "C": Portion of plate false teeth; "D": woman's soiled white blouse, and one loose button from blouse; "G": soiled white skirt; "H": soiled pink panties; "K": 1 Army 45-calibre automatic pistol, No. 1907050; "L": 1 45-calibre automatic pistol clip and 4 cartridges.

"The defendant was privileged to take the stand on his own behalf. And having done so he cannot be heard to complain that his evidence be measured by a rule of credibility which the facts and circumstances of his evidence warranted. The instruction in no way commented upon the evidence. It was but the expression of a rule of law determining its credibility, and however harsh it was fully merited by all the circumstances of the case. The instruction complained of has for its authority the case of *Allen* v. *United States,* 164 U. S. 492 at 499. There the court approving a similar instruction said: 'In the fifteenth assignment exception is taken to the following instruction: "You will understand that your first duty in the case is to reject all evidence that you may find to be false; all evidence that you may find to be fabricated, because it is worthless; and if it is purposely and intentionally invoked by the defendant it is evidence against him; it is the basis for a presumption against him, because the law says that he who resorts to perjury, he who resorts to subornation of perjury to accomplish an end, this is

against him, and you may take such action as the basis of a presumption of guilt." There was certainly no error in instructing the jury to disregard evidence that was bound' (found) 'to be false, and the further charge that false testimony, knowingly and purposely invoked by defendant, might be used against him, is but another method of stating the principle that the fabrication of testimony raises a presumption against the party guilty of such practice.' " *Territory* v. *Truslow, supra,* at 119, 120.

The instruction did not, in the light of the remaining instructions considered in their entirety, result in singling out the defendant for credibility condemnation, nor did its language in any manner intimate or convey to the jury the court's belief of or disbelief in the truth of the defendant's testimony or tend to discredit it. Excerpts from other pertinent instructions given, and touching upon the subject of credibility were:

"TERRITORY'S INSTRUCTION NO. 1 * * * You are the exclusive judges of the facts in these cases and the credibility of the witnesses * * *."

"TERRITORY'S INSTRUCTION NO. 6 Whether or not the complaining witness * * * promptly, after the alleged rape, made complaint either to the police or to other persons, is competent evidence for you to consider as affecting the credibility of * * *."

"TERRITORY'S INSTRUCTION NO. 7 * * * A woman may be a common prostitute, and may still be the victim of a rape. This evidence is to be considered as affecting her credibility as a witness * * *."

"TERRITORY'S INSTRUCTION NO. 21 * * * you are the exclusive judges of the credibility of a witness, of the weight of the evidence, and of the facts in this case. It is your exclusive right to determine from the appearance of a witness on the witness stand, his manner of

testifying, his apparent candor or frankness, or lack thereof, which witness is more worthy of credit, and to give weight accordingly. In determining the weight to be given the testimony of a witness you are authorized to consider his interest, if any, in the result of these cases, his temper, feeling or bias, if any has been shown, his demeanor on the witness stand, his means and opportunity of information, and the probability or improbability of the story told by him.

"If you find and believe from the evidence that any witness in this case has knowingly and wilfully sworn falsely to any material fact in this trial or that any witness has knowingly and wilfully exaggerated or suppressed any material fact or circumstance in this trial for the purpose of deceiving, misleading or imposing upon you, then you have a right to reject the entire testimony of such witness except insofar as the same is corroborated by other credible evidence or believed by you to be true."

Instruction numbered 21 was applicable to all witnesses including the defendant, who as a witness in his own behalf proffered his defense to this preliminary measure of credibility. The jury by its verdict rejected the defendant's entire testimony thus adjudging it uncorroborated and untrue and thereby subjecting his generated defense to the additional rule of credibility now assigned as error. "There is a principle of law, that if a fraud on the court be attempted, in the getting up of false testimony, or by any other artifice tending, or designed to deceive or mislead, or to make the false appear to be the true, and this is knowingly assisted, or procured to be done by the suitor, this is a circumstance which the jury may rightly consider, to the disadvantage of the party making or assisting in such attempt." *Territory* v. *Truslow, supra,* at 119.

Specified error numbered IV is without merit.

V. "The verdict of the Jury is contrary to the law, contrary to the evidence and contrary to the weight of the evidence, in that there was not competent evidence to establish, beyond a reasonable doubt, that the Defendant * * * was guilty of the crime of rape."

Upon review of the records, this court finds that the evidence and the weight of the evidence affirmatively establish beyond a reasonable doubt all material allegations of both indictments.

Under the substantial evidence as outlined throughout this opinion, assigned error numbered V is patently devoid of merit.

The judgments and sentences of the trial court will, accordingly, not be disturbed.

The judgments are affirmed.

*M. L. Heen* (*G. Y. Kobayashi* and *C. Y. Chikasuye* with him on the briefs) for plaintiff in error.

*A. R. Hawkins,* Assistant Public Prosecutor (also on the brief) for the Territory, defendant in error.