# TERRITORY OF HAWAII *v.* LIBERATO GUILLERMO JOAQUIN.

## NO. 2740.

Argued February 15, 1951.    Decided February 5, 1952.

Le Baron and Towse, JJ., and Circuit Judge Sapienza In Place of Kemp, C. J., Retired.

OPINION OF THE COURT BY TOWSE, C. J.

The defendant was convicted of murder in the first degree and sentenced to death.

The record is before this court on writ of error. Eight assignments are specified. The first two allege error in the admission of evidence. The sixth and seventh allege error in the refusal to give instructions. The third, fourth and fifth challenge the sufficiency of the evidence to support the verdict.

222

Supplementing the errors assigned, this court is mandated to review the evidence to determine if the interests of justice require a new trial. (R. L. H. 1945, § 9564.)

The defendant was born in the Philippines and migrated to the Territory in 1922. His wife resides in the Philippines. He was employed as a doorman at a theater in Honolulu at the time of the homicide and was the paramour of the deceased, a taxi dancer. For twenty-two months preceding the homicide he courted her and was a constant habitue of the dance hall at which she was employed, there spending liberally for the privilege of her exclusive company during working hours. At times voluntarily, and at times upon her demands and insistence, he gave her gifts of cash totalling approximately $8,000 and personal jewelry. At her request he provided an initial payment of $1,800 for the purchase of a new car for her use. Reciprocity in the circumstances consisted of engaging in illicit relationship from time to time at a hotel. The deceased represented that she was a divorcee and promised to marry the defendant, but postponed setting of the wedding date several times. At her request he consented to a delay of the wedding until July and again to October. On October 23 the defendant saw the deceased in company with another man, causing him to become suspicious of her promises of marriage. That evening he called at her home during her absence and there found men's clothing in a closet. This confirmed his suspicions that her promises of marriage had been insincere, and that he had been deceived and victimized by her demands for money and gifts. His savings were exhausted and he had borrowed sizable sums to satisfy her artful demands. These realizations precipitated progressive moods of emotional depression, despair and anger. On October 25 the defendant purchased a hunting knife with five-inch blade, dulled its brilliance, and concealed it upon his person by strapping it to his right leg.

On October 27 he typed two letters to his brother. The first letter recited his design to take her life; the second to take his own. Excerpts from the first letter are of pointed significance to the crime laid in the indictment: "I hate to do this but this only my way I can see to make her even with me * * *. Only to night she told me the truth that she is married and stay with the husband and she can not make her promised to merry me * * *. This is the main reason that makes me mad * * *. I do not like the idea that she lie to me that's why I kill her without mercy * * * . I will meet her in thy Kingdom of God in heaven."

He visited her that evening but made no attempt to execute his declared intentions. Instead, he made an engagement for the next evening, at which time they proceeded to a hotel, where, at the suggestion of the deceased the defendant had registered that morning as husband and wife. She had requested him to bring $100. The defendant was able to produce only $85. At this the deceased became enraged, cursing and kicking the defendant and striking him about the face. He left the bed, walked to the bathroom, secured the knife which he had placed there on entering the suite, and returning to the bedroom where the deceased lay upon the bed, stabbed her repeatedly about the body and face inflicting the wounds resulting in death. The deceased's body fell to the floor during the stabbing. The defendant replaced it upon the bed, washed himself, dressed and departed from the hotel grounds, and proceeded by taxi to the home of his brother at Wahiawa. There he unsuccessfully attempted suicide by taking a quantity of sleeping tablets, awakening the following night in a hospital under police custody.

The first assignment alleges error in the admission into evidence of a written statement or confession of the defendant on the ground that it was not voluntarily made. It is alleged that the trial court erred in failing to recognize its

involuntary nature; that the conditions surrounding the taking of the confession were "inherently coercive"; that the requisite of voluntariness was not satisfied in the circumstances by merely establishing that no promise or threat was made to induce the confession; that the conditions and circumstances surrounding the defendant's confession made at the time he was a patient in the mental ward of a hospital under police guard without a doctor or nurse present and recovering from an attempted suicide, and not being represented by counsel nor in contact with friends or relatives, rendered the confession involuntary.

Section 9846 of Revised Laws of Hawaii 1945 provides, *inter alia,* that "No confession shall be received in evidence unless it shall first be made to appear to the judge before whom the case is being tried that such confession was in fact voluntarily made * * *."

The record bears the following material facts established at trial relative to the confession. While the defendant was in the mental ward of the Queen's Hospital recovering from his attempted suicide he was interviewed by police officers. The interview was recorded in shorthand and later reduced to a typewritten statement. The homicide and attempted suicide occurred on the evening of October 28. Dr. Bryant Wedge, a psychiatrist, attended the defendant, who told him that he desired to see a police officer; and on the second day following his admission that he desired to make a statement. The interview commenced at approximately 10:00 o'clock a. m. on October 31 and was concluded in fifty minutes. It was read by the defendant who initialed each page and signed the final page at 1:45 o'clock p. m. the following day at the police station. Dr. Wedge testified that 1½ grains of seconal had been prescribed and administered to the defendant to induce sleep the evening prior to the taking of the statement; that the ordinary period of reaction to the dose prescribed was ap-

proximately five to eight hours; that he conversed with the defendant the following morning at least twelve hours after administration of the seconal; and that at the time the statement was taken the seconal would have had no effect upon the defendant's mental faculties. He further testified that the defendant appeared to be in possession of his faculties and was alert; and though appearing somewhat preoccupied, did not appear physically weak.

At the interview, one uniformed police officer, two detectives and a shorthand reporter were present. The interrogation was in English. The defendant was reasonably literate and possessed a fair knowledge of the English language. One of the detectives, a Filipino, was present at the interview at the request of the defendant. Upon entering the room, this officer inquired of the defendant's health. He replied, "A little weak, but I feel all right"; adding later, that he did not want to give a statement or read or sign "anything" unless the Filipino detective was present. Another detective testified that he asked the defendant how he felt, and that "he said he felt better, he felt all right and that he was very anxious to get this off his chest." At no time did the defendant indicate or express any difficulty in understanding the questions asked of him. Defendant's comprehension of the English language is attested by the necessity for an interpreter at the trial on only several occasions. At no time prior to or after making his statement did he request representation of counsel, or that relatives or friends be summoned. Prior to signing the statement he initialed each of its thirteen pages, directing attention to ten corrections and changes he desired made, initialing each correction. The statement was pointedly detailed. It recounted the relationship of the defendant and the deceased in minute detail as to time, place, circumstances and other matters.

That a confession secured under circumstances amount-

ing to inherent coercion is involuntary and inadmissible, is recognized in *Ashcraft* v. *Tennessee,* 322 U. S. 143. None of the elements of inherent coerciveness present in that or other precedent urged by the appellant was established at the trial. In *Ashcraft* v. *Tennessee, supra,* the defendant was held incommunicado for thirty-six hours without sleep or rest and questioned continuously by relays of officers and investigators. In *Wan* v. *United States,* 266 U. S. 1, the accused was held incommunicado in a hotel room for one week. During this period, while gravely ill and in intense pain, he was subjected to continuous questioning. In *White* v. *Texas,* 310 U. S. 530, the defendants were subjected to physical abuse in circumstances inspiring terror by being handcuffed, flogged and physically forced to confess. In *Chambers* v. *Florida,* 309 U. S. 227, the defendant was subjected to continuous questioning for a period of one week.

The undisputed facts established at trial upon the voluntary nature of the confession fail to disclose any suggestions or indications, or the presence of any physical or psychological duress or coercion which might have induced or tended in any degree to induce the statement. The uncontradicted testimony of Dr. Wedge, the defendant's voluntary consent to the giving of the statement, the absence of facts or circumstances of any nature indicating or suggesting physical or psychological coercion, duress, promise of reward or immunity, or threats, or of inherent involuntariness of any nature inducing or influencing either the obtaining or signing of the statement — all compel concurrence in the trial judge's finding that it was in fact voluntarily made.

We find ample evidence sufficient in fact to affirm the finding of the trial judge in thus summarizing the issue: "The evidence so far adduced does not establish to the mind of this Court any such elements of compulsion as under

the law will render a statement or confession involuntary. There has been no evidence of any force or any threats, any offers of immunity or hope of reward. The statement was voluntary. It is also characterized by the fact that the defendant arose and demonstrated the circumstances, that would not be compatible, entirely compatible with a statement taken under force or duress of any kind, the expression of the defendant that he wanted to make a statement and the other evidence convinces the Court, and the Court finds the statement was voluntary * * *."

The confession was properly received in evidence. (*Territory* v. *Alcosiba,* 36 Haw. 231; *Territory* v. *Palakiko et al.,* 38 Haw. 490; *Palakiko* v. *Territory of Hawaii,* 188 F. [2d] 54; *Ter. Haw.* v. *Matsumoto,* 16 Haw. 267; *Wilson* v. *United States,* 162 U. S. 613; *Bram* v. *United States,* 168 U. S. 532; *Powers* v. *United States,* 223 U. S. 303.)

The second assignment alleges error in the admission into evidence of five photographs. The exhibits are 8″ x 10″ enlargements of the deceased and of the scene of the homicide. The ground of error is that these exhibits were inflammatory and prejudicial in nature.

Exhibit one, taken in the morgue on the afternoon of the homicide, is a frontal view of the nude body of the deceased from head to hips. It includes five of the stab wounds, a medium-sized mass of intestines protruding from one of the abdominal wounds, and bloodstains upon the arms, shoulders and face.

Exhibit two is a frontal view of the clothed body of the deceased upon the bed. It includes bloodstains upon the face, arms and clothing.

Exhibit seven displays the clothed body upon the bed with bloodstained legs exposed. The foreground includes a large bloodstained area upon the floor beside and under the bed.

Exhibit eight is a close-up view of the bloodstained area

on the floor, and includes the legs of the deceased upon the bed.

Exhibit nine is a view of the bedroom displaying the bed and other furniture, a knife and other articles upon a table, a portion of the bloodstained area on the floor, and the right foot of the deceased upon the bed.

Ten photographic exhibits of the deceased and of the scene of the homicide were introduced in evidence by the Territory. Exhibit three is a morgue photograph of the nude back from head to abdomen, and includes five stab wounds about the back, shoulders and head. Exhibit four is a reverse view of exhibit nine, and includes both blood-stained legs upon the bed. Exhibit five is a view of the front exterior of the duplex cottage on the hotel grounds in which the homicide took place. Exhibit six is a view of the bedroom in an undisturbed condition, including the hallway and a portion of the bed. Exhibit ten is a close-up view of the frontal exterior of the Waikiki suite of the cottage, in which the deceased's body was discovered.

The exhibits, as graphic facsimiles of the conditions which they portray, are not inadmissible upon the sole grounds of their gruesome subject matter. (*Potts* v. *People,* 114 Colo. 253, 158 P. [2d] 739, 159 A. L. R. 1426; *People* v. *Becker,* 300 Mich. 562, 2 N. W. [2d] 503, 139 A. L. R. 1171; *King* v. *State,* 108 Neb. 428, 187 N. W. 934; *State* v. *Bailey,* 79 Conn. 589, 65 Atl. 951.) The exclusion of photographs upon the sole ground that they reproduce conditions, views or subject matter which may be inherently gruesome or shocking, would impede to the point of precluding proof of material issues in indictments charging atrocious and heinous physical crimes such as murder in the first degree. (Underhill, *Criminal Evidence,* § 117, p. 161 [4th ed.]; Scott, *Photographic Evidence,* § 692, p. 646; *Young* v. *State,* 38 Ariz. 298, 299 Pac. 682, 646; *State* v. *Fine,* 110 N. J. L. 67, 164 Atl. 433; *State* v. *Woods,* 62 Utah

397, 220 Pac. 215; *State* v. *Lantzer*, 55 Wyo. 230, 99 P. [2d] 73.) Their admissibility is dependent upon the relevancy which they bear to the crime laid in the indictment — that of murder in the first degree. It is not contended nor do we find that the police officers in determining the subject matters to be photographed attempted to reproduce or incorporate any physical objects, matters or conditions in the exhibits which did not accurately represent the true and actual condition and state of the corpse or the *locus in quo* at the time and place they were taken. No extraneous props, matters, objects or assimilated conditions irrelevant to the crime and surroundings were included.

The principle that demonstrative evidence of this nature possessing probative value relevant to the nature and commission of the crime charged, or which aids in proof of the manner in which it was committed is admissible, is well settled. (*Territory* v. *Abellana*, 38 Haw. 532; *Hall* v. *The State of Florida*, 78 Fla. 420, 83 So. 513, 8 A. L. R. 1034; *Grissett* v. *State*, 241 Ala. 343, 2 So. [2d] 399; *Janovitch* v. *State*, 32 Ariz. 175, 256 Pac. 359; *The People* v. *Jersky*, 377 Ill. 261, 36 N. E. [2d] 347.) Photographs of the victim of a homicide, and of the *locus in quo* are specifically embraced within the rule. (*Bassinger* v. *State*, 142 Neb. 93, 5 N. W. [2d] 222; *Commonwealth* v. *Dreamer*, 324 Pa. 220, 188 Atl. 117; *State* v. *Holt*, 47 Nev. 233, 219 Pac. 557; *Mardoff* v. *State*, 143 Fla. 64, 196 So. 625.)

"The value of a pictorial representation of the scene of a crime is obvious. From the very nature of the crime of homicide it is not possible for the trial jury to view the premises before physical appearance of the scene is changed by removal of the victim's body. It is common knowledge that the descriptions given by witnesses, however conscientious, who have observed the body of a murdered person and the surroundings will vary often to a surprising degree. No better way has so far been devised to show the scene of

a homicide than a photograph taken before the body of the deceased and the objects near or around it have been disturbed." (*Mardoff* v. *State, supra,* p. 67.)

Photographs of a homicide victim which depict the fatal wounds or indicate the manner of death are admissible for the purpose of identifying the victim; and this rule's observance is not affected by the fact that there is no actual dispute as to the identity of the deceased. (*Sanders* v. *State,* 202 Ala. 37, 79 So. 375; *Janovitch* v. *State,* 32 Ariz. 175, 256 P. 359; *Trammell* v. *State,* 193 Ark. 21, 97 S. W. [2d] 902.) Moreover, it is well settled that photographic evidence, though cumulative of oral testimony, is none the less admissible if it reasonably tends to prove or disprove a material fact in issue. (*McKee* v. *State,* 249 Ala. 433, 31 So. [2d] 656; *Commonwealth* v. *Ferry,* 326 Pa. 129, 191 Atl. 130; *People* v. *Smith,* 15 Cal. [2d] 640, 104 P. [2d] 510.) The court in *People* v. *Balestieri,* 23 Cal. App. 708, 711, 139 Pac. 821, 822, supports the applicable rule in stating that "It was important * * * that the jury should gain a clear perception of the precise manner in which the decedent came to his death. These pictures served to illustrate the testimony of the witness * * * as to the manner and form of the assault upon his deceased companion. The testimony of the autopsy physician, which was in some respects as striking and gruesome in detail as are these pictures, was properly admissible * * * and the fact that its striking and gruesome detail might awaken feelings of horror and, perhaps, indignation in the minds of the jury, would not be a sufficient reason for the exclusion of such evidence * * *."

The admission in evidence of the exhibits resting in the discretion of the trial judge, the exercise of that discretion will not be disturbed in the absence of a showing of abuse thereof. (*Territory* v. *Abellana,* 38 Haw. 532; *State* v. *Stuart,* 132 Me. 107, 167 Atl. 550; *Commonwealth* v.

*Winter,* 289 Pa. 284, 137 Atl. 261; *State* v. *Robinson,* 201 S. C. 230, 22 S. E. [2d] 587; *State* v. *Messer,* 194 La. 238, 193 So. 633; *State* v. *Mannion,* 82 N. H. 518, 136 Atl. 358.)

We find no such abuse. The exhibits were properly received in evidence.

The sixth assignment alleges error in refusing to give the defendant's requested instruction upon the subject of manslaughter. It is alleged by the defendant that the refusal resulted in "complicating to confusion the consideration of malice and passion in relation to manslaughter"; and that while the jury was instructed upon manslaughter, a lesser crime under the indictment, that it was nevertheless not adequately covered.

Upon the offense of manslaughter, the jury was instructed: "You are instructed that under our laws any person charged in this indictment may be found guilty of any offense necessarily included in the offense charged in this indictment as the facts proved may warrant.

"In this connection you are instructed that the offense of murder in the second degree and manslaughter as defined in these instructions is a necessarily included charge under the indictment in this case.

"Gentlemen of the Jury, I instruct you that Manslaughter is defined in our statutes as follows: 'Whoever kills a human being without malice aforethought, and without authority, justification or extenuation by law, is guilty of the offense of Manslaughter.'

"I instruct you that the mere fact of passion on the part of the slayer will not reduce the crime from murder to manslaughter, where he entertained a previous purpose to kill, unless it is made to appear that such purpose was abandoned before the killing.

"The difference between murder and manslaughter is that murder has in it the element of malice aforethought and manslaughter has not. The law regards a homicide

committed under the influence of sudden passion, or in hot blood, produced by adequate cause and sufficient to dominate the mind of an ordinary man under the same circumstances so as to dominate or suspend the exercise of judgment and self control and deprive him of power to form a design to kill with deliberate mind as manslaughter. Such passion, however, must have continued to exist until the commission of the killing and if from any circumstances whatever it appears that the person committing such killing reflected, deliberated or cooled any time before such killing, such killing would not then constitute manslaughter."

The evidence developed under the issues raised by the nature of the crime laid in the indictment is determinative of the nature and character of the offenses required to be included thereunder. (*Ter.* v. *Alcantara,* 24 Haw. 197.) If, therefore, the instruction given upon the lesser included offense of manslaughter was sufficient to apprise the jury under the evidence to return a verdict of manslaughter if it determined that the evidence so warranted, the refusal to give the defendant's requested instruction would not constitute prejudicial error. It is the duty of the court when charging the jury in a prosecution for homicide to instruct them upon the grade of offense for which they may, under the evidence adduced, find the defendant guilty. An indictment of murder in the first degree is deemed to include all the lower degrees of homicide; and when there is evidence adduced tending to show the commission of a lesser grade or degree of the offense, the court is required to instruct the jury upon those inferior grades or degrees as well as upon the higher one in support of which there is other evidence properly applicable and upon which the jury would be warranted in finding the accused guilty, even though such instructions are not specifically requested.

The instruction given upon the law of manslaughter

defines that offense: "Whoever kills a human being without malice aforethought, and without authority, justification or extenuation by law, is guilty of the offense of manslaughter." (R. L. H. 1945, § 11396.)

This common-law definition has been adopted and preserved by statute. "At common law manslaughter was defined as the 'unlawful killing of another without malice express or implied.' This definition has many times been approved by courts of high authority and is now so fortified by judicial sanction that it is no longer open to attack." (*Ter.* v. *Braly,* 29 Haw. 7, 11, 12.) The absence of malice aforethought is the distinguishing element between the two crimes. "If simply unlawful, and without any deliberate and malicious intention, it is manslaughter." (*The King* v. *Bush,* 1 Haw. 62, 63.) To determine the distinction, it is necessary to inquire whether the defendant was subjected to such provocation by the deceased as to generate sudden hot blood or passion, as a result of which his reason became disturbed to such degree that he thereafter acted without deliberation or reflection. This settled principle requires that the homicide be committed under, and generated by passion, and not after a lapse of time, however short, sufficient to permit a cooling of the hot blood or passion with accompanying restoration of reasoned judgment. This alternate determination was sanctioned and defined in the instruction given, thus enabling the jury to find the defendant guilty of manslaughter upon such evidence properly applicable thereto as would warrant that finding.

The instruction denied, save for the phrase "in the heat of passion," was covered in the statutory definition of manslaughter. The principles of law applicable to the element of passion were adequately and correctly covered in the last paragraph of the instruction given. (*Territory* v. *Martin,* 39 Haw. 93; *Ter.* v. *Honda,* 31 Haw. 913.)

We find no complication or confusion upon the subjects

of malice and passion in relation to the law of manslaughter as a lesser included offense in the instruction given.

The refusal to give defendant's requested instruction upon the burden of proof constitutes assigned error number seven. It is alleged that the instruction given upon that subject is confusing and incomplete in relation to the presumption of innocence of the defendant in that it may be construed as requiring the defendant to prove his defense beyond a reasonable doubt.

Upon the burden of proof the jury was instructed: "I further instruct you that the burden of proof is upon the Territory and the law, independent of the evidence, presumes the defendant to be innocent, and this presumption continues and attends him at every stage of the case until it has been overcome by evidence which proves him guilty to your satisfaction and beyond a reasonable doubt * * *."

Section 11391 of Revised Laws of Hawaii 1945 provides: "When the act of killing another is proved, malice aforethought shall be presumed, and the burden shall rest upon the party who committed the killing to show that it did not exist, or a legal justification or extenuation therefor." The record bears uncontradicted evidence of the slaying of the deceased by the defendant. That evidence, under section 11391, devolved and settled the burden of proof upon the element of malice aforethought to and upon the defendant, subject to proof of justification or extenuation. But no such proof was made in this case.

The assignment is patently without merit inasmuch as the instruction refused does not correctly state the principles of law applicable under the evidence developed at trial. The identical instruction given has been approved by this court in *Ter.* v. *Buick,* 27 Haw. 28.

The third, fourth, fifth and eighth assignments allege error in the verdict upon the ground that it is contrary to

the law, the evidence and the weight of the evidence "in that there was not competent evidence to establish, beyond the reasonable doubt, that the defendant is guilty of murder in the first degree." This court has reviewed all the evidence presented at the trial and finds that the verdict was supported by ample and substantial evidence. The record fails to reveal any error in respect of the grounds alleged in these four assignments, and is devoid of prejudicial or other error which would warrant vacating the judgment or which would entitle defendant to a new trial.

Judgment affirmed.

*R. R. Kemble* (also on the briefs) for plaintiff in error.

*A. R. Hawkins,* Assistant Public Prosecutor (*C. M. Hite,* Public Prosecutor, with him on the briefs), for defendant in error.