PAUL H. MARDORFF v. STATE.

196 So. 625
En Banc
Opinion Filed May 21, 1940
Rehearing Denied June 19, 1940

*J. B. Patterson,* for Plaintiff in Error;

*George Couper Gibbs,* Attorney General, *Thomas J. Ellis* and *William Fisher, Jr.,* Assistant Attorneys General, and *G. A. Worley,* State Attorney, for Defendant in Error.

THOMAS, J.—Paul H. Mardorff was convicted of the murder of his wife and, mercy not having been recommended by the jury, was sentenced to suffer the death penalty.

His counsel has urged this Court to grant a new trial because of error claimed to have been committed by the trial judge in allowing the introduction of certain photographs and in denying a new trial based on the grounds that the evidence showed the defendant to have been insane at the time of the commission of the alleged homicide and that his act was performed in the heat of passion and upon sudden provocation. We will dispose of the questions in that order.

Counsel is correct in his statement that the photographs are gruesome. They depict the body of the deceased as it was discovered by the police when they entered the apartment occupied by her and her husband, the defendant, the night of the tragedy. Four of them were taken before the body was moved by any one and the fifth after it had been lifted from the wall exposing the hilt of the knife protruding from the dead woman's back.

During a quarrel the defendant seized a long Chinese

dagger from the place where it hung on the wall and stabbed his wife twenty times, the last one in the back just below the shoulder blade. He did not trouble to remove the weapon but left it imbedded in her body. He then removed her from the bloodstained bed where he committed the heinous offense and propped her against the wall between the foot of the bed and a bookcase standing nearby. After washing his hands he left the place and in hurrying across the street collided or was struck by an automobile. On the way to the hospital in an ambulance he asked for a cigarette and after arrival there talked with police officers about the crime, telling them that he had killed his wife, quoting the attending physician, with "some sort of a little Chinese affair, with a letter opener or some sort of cutting instrument."

The first objection urged to the admission in evidence of the pictures is that when they were filed there was no identification of the person whose body appeared in them. This position is not sound. At the time of the offer, testimony had been adduced about the defendant's statement which we have quoted and a police officer had sworn that the apartment had been entered by use of a pass key obtained from a tenant in the same building; that the body had been identified by several of the neighbors of the deceased and; that the four photographs had been taken before any one touched the body. There was no doubt even at this time about identification and subsequent evidence substantiated this proof.

Counsel contends that the pictures tended "to inflame the minds of the jury to a state of passion" and to "prejudice them against" the defendant rendering the evidence inadmissible. That this proof was prejudicial to the defendant there can be no doubt, but, as was so aptly stated in Whar-

ton's Criminal Evidence (11 Ed.), Sec. 773, p. 1321: "Where they are otherwise properly admitted, it is not a valid objection to the admissibility of photographs that they tend to prejudice the jury. Compctent and material evidence should not be excluded merely because it may have a tendency to cause an influcnce beyond the strict limits for which it is admissible."

In Lindberg v. State, 134 Fla. 786, 184 South. Rep. 662, we quoted the above authority and approved exhibition to the jury of a picture showing the body of the murder victim.

The value of a pictorial representation of the scene of a crime is obvious. From the very nature of the crime of homicide it is not possible for the trial jury to view the premises before physical appearance of the scene is changed by removal of the victim's body. It is common knowledge that the descriptions given by witnesses, however conscientious, who have observed the body of a murdered person and the surroundings will vary often to a surprising degree. No better way has so far been devised to show the scene of a homicide than a photograph taken before the body of the deceased and the objects near or around it have been disturbed.

The admissibility of such evidence must be determined by the trial judge after an inquiry as to whether objects appearing in the picture are in the same position as when the crime was discovered to preclude fabrication of testimony, for a picture of the reconstruction of the crime would be harmful in the same degree that the true representation would be helpful to the jury in comprehending the real conditions of the place where the crime was committed. Wharton's Criminal Evidence (11th Ed.), Vol. 2, Sec. 773; Ortiz v. State, 30 Fla. 256, 11 South. Rep. 611; Wharton's Criminal Evidence, *supra*.

These precautions were thoroughly observed by the trial court in this case. Four of the photographs showed the room in which the murder was committed and the body found immediately after officers entered by the means of the borrowed pass key. The fifth was taken without any rearrangement of the objects in the room except that the body had been slightly moved to show how the weapon which caused death had been plunged in the victim's back and left there, the hilt exposed.

We close our discussion of the correctness of the court's action in admitting the pictures with the observation that the defendant could not complain because of their shocking nature when the horrible scene disclosed was one which he, himself, created.

Our perusal of the record has not disclosed any proof that the defendant was insane immediately following the tragedy. He was struck by an automobile as he fled the scene but that circumstance does not indicate that his mentality was impaired. His conduct in the ambulance as he was taken to the hospital and conversations after arrival there do not indicate that he had become mentally unbalanced.

It has been strenuously argued that the homicide was perpetrated at a time when the defendant was not in full possession of his faculties because of the sudden knowledge of his wife's relations with another man and it is said in his behalf that he should have been awarded a new trial because he committed the offense in the heat of passion and upon a sudden provocation superinduced by the discovery of his wife's unfaithfulness.

The interpretation which the jury evidently placed upon the evidence and which was entirely justified was that whatever association she may have had with the other person

was not learned by the defendant at the moment he killed his wife. From a distant city he had corresponded with her about the attentions of the man whom they both knew and who was financing the husband in some of his affairs. Upon returning to their home the matter was discussed and for a considerable time immediately preceding the tragedy they had bickered and quarreled. It is not important here to pass upon the question whether the wife's conduct was in fact reprehensible. It is plain from the record that whatever information the husband obtained about the wife's relations with the other man was in his possession for a sufficient period of time to refute the position that it furnished a sudden provocation. Nor do we feel that the enormity of the offense was lessened by his having committed it in the heat of passion.

The defendant foully murdered his wife at the culmination of a long argument. He stabbed her twenty times, the last one in the back, and left his weapon there. He placed her body against the wall of their bedroom, washed his hands and departed.

The case was well tried and the evidence abundantly justified the verdict.

Affirmed.

TERRELL, C. J., WHITFIELD, P. J., and BUFORD, J., concur.

BROWN and CHAPMAN, J. J., dissent.

CHAPMAN, J. (dissenting).—Careful study and consideration has been given to the transcript and briefs filed in this case. The jury convicted plaintiff in error of murder in the first degree, without recommendation to mercy, and a judgment of death by electrocution was entered on said verdict. The evidence shows that the plaintiff in error murdered his wife in a most brutal and inhuman manner.

The defendant, while on the stand in his own behalf, gave testimony from which a jury could reasonably infer that the defendant murdered his wife as charged in the indictment.

Counsel for defendant below, during the progress of the trial, practically admitted the guilt of the defendant as charged, but at the opportune time offered the testimony of two or three disinterested witnesses, and their evidence is that at the time of the commission of the crime the defendant was insane. The testimony of these non-interested witnesses on the part of the defendant's sanity is strongly supported by the facts and circumstances of this case. The evidence also showed the previous good character of the defendant.

The defendant moved to Miami from the State of Pennsylvania and obtained employment in his trade, but the loss of a thumb rendered it impossible for him to work further at this trade, and he afterwards worked, or tried to obtain work, as a carpenter and a painter but without much success. He borrowed money and went to Nashville, Tennessee, and studied and otherwise qualified himself as a Linotype operator. He borrowed the money to pay his expenses while in Nashville. He returned to Miami and again failed to obtain work or employment. He was 48 years of age, had neuritis which required the removal of his teeth, and it was necessary to borrow money and at the time of the commission of the crime a portion of his teeth had been removed. He was extremely nervous, drank some whisky and, in my judgment, was a mentally sick man. While the defendant was in Nashville the deceased had dates with a gentleman friend, who admitted on the witness stand that he had a number of dates with the defendant's wife while he was away, and by secret arrangements continued to associate

with her after the defendant's return to Miami. He admitted an affection for the deceased while on the stand, and claimed his association with the defendant's wife was altruistic and of lofty motives, as he accompanied her to church, Sunday school, and the theater, while a witness who occupied an adjoining apartment, testified that the friend of the defendant's wife, on returning from church, Sunday school and the theater, would go into the bed room of the deceased and remain there several hours, and the starting of the motor when he left around 3:00 or 4:00 o'clock A. M. would awaken the neighborhood. The wife borrowed money from her friend and frankly admitted her relations with him to her husband, the defendant.

We now have a man 48 years of age, who has always made a respectable living, thrown out of employment; he is broke or financially embarrassed, his wife borrows money from her lover to pay the defendant's expenses while studying to become efficient as a Linotype operator, he returns to Miami and fails to get employment, and additional money is obtained to pay the costs of extracting his teeth; his wife unfolds to him her clandestine relations with her lover and taunts him about not becoming a more successful man; he drinks whisky to excess; his health is gone, he has no money, he cannot get employment, his wife keeps company with another man, and the defendant becomes despondent and kills his wife. It seems to me, from the testimony, that his morale was destroyed and there are strong facts and circumstances to convince me on this record that his mind was unbalanced. The law in its wisdom makes a provision for such a condition, but apparently the jury disregarded the same.

I cannot comprehend how a man approaching the meridian of life can remain calm and steadfast and not lose his

equilibrium or mental poise or commit an unlawful act or deed when required to face the solemn truth that his wife and the mother of his daughter has betrayed his name and sold her virtue for a few paltry dollars. The evidence convinces me that the man was insane at the time the crime was committed. The conduct of his wife and circumstances beyond his control dethroned his reasoning.

The prosecution offered in evidence five photographs and each of these photographs were made in the apartment where the parties resided, and each contained a picture of the deceased which the testimony shows received some twenty wounds, causing her death. The object or purpose of offering these five photographs in evidence has not been shown. They could not be used to assist in explaining any testimony offered by the State, as it was admitted, broadly speaking, that the crime was committed in the apartment. The blood-stained body of the deceased, the gaping wounds, the partially nude body, and the dagger in her body in the back between the shoulders, in my judgment, so inflamed the minds of the jury that it made it impossible for them to consider the point in issue, viz.: Whether or not the defendant was sane at the time of the commission of the crime.

In Hall v. State, 78 Fla. 420, 83 So. 518, 8 A. L. R. 1234, the prosecution offered in evidence in a homicide suit two photographs, one of the Carter house, and the other of the room in the house where the homicide occurred. When the latter picture was taken, some one placed on the floor of the room two pieces of paper, one indicating where Mr. Carter fell when he was shot, and the other indicating where the deceased fell. It is not clear what purpose was served in introducing this evidence, as there was no dispute as to the house or the room in which the crime occurred. Judge ELLIS in delivering the opinion of the Court, said that if the

evidence (meaning the photographs) was permitted to stand, it could have worked no injury to the defendant in view of the nature of the case, and the character of the defendant. The photographs were introduced as mere representations of the place where the crime was committed, and not representation of the act itself, and as there was no dispute between the parties as to the place *where* the homicide occurred and who committed it and upon whom it was committed, the photographs appeared to have been unnecessary but harmless. The fact of placing the pieces of paper on the floor to represent the spot where the two men were lying after the shots were fired made the photographs a kind of tableau picture, yet they were not subject to the criticism that any one's version, theory or interpretation of the character of the act was thus sought to be brought before the jury as a photographic view of the actual occurrence.

In Adams v. State, 28 Fla. 511, 10 So. 106, a witness by the name of John V. Brown was offered by the State and had a full and complete knowledge of the *locus in quo*, and drew a map showing the roads, houses, fields and fixed objects. The map was offered in evidence and the witness referred to the map when explaining his testimony. This Court held that there was no error in the ruling. While it is true these photographs were mentioned in this case, there was no evidence of pictures or photographs, but only a map of the *locus in quo*.

In Oritz v. State, 30 Fla. 256, 11 So. 611, there was offered in evidence a photograph of the Havana Hotel, showing the place where the alleged crime was committed. The photograph was approximately ten inches wide by eight inches high and was a complete picture of the front of the hotel where the deceased was killed. There is no question about the picture being a true and correct representation of

the scene where the killing occurred. The trial court refused to admit the photograph on behalf of the defendant, and on appeal here this Court sustained the ruling of the lower court and held that the picture could serve no auxiliary purpose and was of no assistance to the jury in the case, but would have created confusion.

In Young v. State, 85 Fla. 348, 96 So. 381, this Court, speaking through Mr. Justice ELLIS, said:

"At the risk, however, of being criticized for unnecessary words, we will say that this Court has never placed itself upon record as announcing a rule of evidence under which any drawing, map, plan or sketch, however crudely executed and inaccurate it may be as a representation of a place the topography and landmarks of which are objects about which testimony is offered, may be exhibited in evidence.

"The rule as announced by this Court upon the subject is as follows: 'A map, plan or picture whether made by the hand of man or photography, if *verified* as a true representation of the subject about which testimony is offered, is admissible in evidence to assist the jury in understanding the case.' See Adams v. State, 28 Fla. 511, 10 South. Rep. 106."

It will be observed that the rule in Adams v. State, *supra,* is cited as to photography which may be used to assist or help a witness to explain his evidence.

In the case of Sanford v. State, 90 Fla. 337, 106 So. 406, this Court said: "There was no error in admitting in evidence a picture, identified as a true representation of the *premises* where the homicide occurred." There is cited: Adams v. State, 28 Fla. 511, 10 South. Rep. 106; Young v. State, 85 Fla. 348, 96 South. Rep. 381.

In Lindberg v. State, 134 Fla. 786, 184 So. 662, this Court upheld a judgment of conviction wherein a photograph of

deceased's body lying on the ground was taken a few hours after the homicide and before the body had been removed. This Court held that the photograph was properly admitted over the objection that the same was not material to the issues involved. The Lindberg case is bottomed on Dedge v. State, 68 Fla. 240, 67 So. 43, where photographs on the *scene* of the homicide were held admissible. While it is true that on the objection thereto made on the admissibility of the photographs a correct rule was enunciated by this Court on the facts of that particular case, we have in the case at bar not one photograph but five, and the relevancy of the five photographs was not made to appeal on the part of the prosecution. One of the photographs, if material evidence, would have been sufficient under the rule of Lindberg v. State, *supra,* but no showing was made in the lower court as to the (a) materiality of either of the five photographs; or (b) the relevancy of either thereof. 20 Am. Jur., page 609, par. 729, states the rule, viz.:

"729. Relevancy of Photographs: Prejudicial Character.—It is always essential to the right to introduce a photograph in evidence that it have a relevant and material bearing upon some matter in controversy at the trial, and·the party offering such evidence should give proof of its relevancy to the issue before the jury. A photograph which is entirely irrelevant and immaterial to any issue in the cause and which is of such a character as to divert the minds of the jury to improper or irrelevant considerations should be excluded from evidence. The determination of the relevancy and materiality of a photograph is left to the sound discretion of the trial judge. Photographs that are calculated to arouse the *sympathies* or *prejudices* of the jury are properly excluded, particularly if they are not substantially necessary or instructive to show material facts or conditions." (Emphasis supplied.)

It appears that the five photographs showing different positions of the partially nude body of the deceased is secondary evidence, as several policemen gave testimony as to every fact disclosed by the photographs. Photographs must be relevant for the purpose of explaining and applying the evidence and assisting the court and jury to understand the case. Photographs should not be admitted when they distract the attention of the jury from the main issue or unduly emphasize the claims of one of the parties, or when the same would arouse the sympathies or prejudices of the jury rather than throw real light upon the issues. See 22 C. J., page 913-14, par. 16(a); 10 R. C. L., page 1153, par. 356.

Wharton's Criminal Evidence, Vol. 2, page 1323, par. 773, treats the competency of photographs in language, viz.:

"773. Photographs. * * * The competency of photographs as evidence is a matter for the court's determination; the weight to be given the photographs is for the jury. While conclusive effect as a matter of law should not be accorded by the jury to such photographs admitted in evidence, yet the weight given them should depend upon the skill, accuracy, and manner in which they are shown to have been taken, and should be considered under the same tests as other evidence. The admission of photographs and the use to be made of them on the trial must necessarily rest largely in the discretion of the trial judge, who can determine whether they serve a proper purpose in the jury's enlightenment. For example, the trial court has discretion to admit in evidence a photograph of wearing apparel taken from a murdered body, although the apparel is in court at the time of the trial."

Underhill's Criminal Evidence, Vol. 2 (2d Ed.), pages

108-12, pars. 103-4; State v. Turner, 126 Me. 376, 138 Atl. 562.

The introduction into evidence by the prosecution of the five "gruesome and morbid photographs" showing the partially nude body of the deceased, the wounds on the body, the blood flowing from the wounds, the dagger penetrating her back, and the hands of a person upholding the body of the deceased so that the photographs could be taken, was calculated to arouse the sympathies and prejudices of the jury and the facts established by the photographs having been testified to by the different officers appearing on the scene, and the relevancy not being fully established, the lower court abused its discretion in admitting the five pictures into evidence to be considered by the jury in deliberating upon its verdict.

There is no testimony in the record to show or establish a premeditated design on the part of plaintiff in error to kill or murder his wife. The testimony on the part of the prosecution to show that the defendant committed the crime was none too strong, but when the defendant took the stand as a witness in his own behalf, testimony was elicited from which it can be reasonably inferred that the defendant killed the deceased. There was no threat of violence shown by the prosecution, or any motive to kill his wife, and the only evidence connecting him with the killing was that he was seen leaving the apartment and throwing himself under a car, from which he received some wounds, and was taken to the hospital. The twenty wounds on the body of the deceased, coupled with efforts of the defendant to do himself an injury by throwing himself under the automobile, are some evidences of an unbalanced mind.

The law requires premeditation or intent to kill or murder to be established beyond a reasonable doubt, like other

material allegations of an indictment. In the case of Forehand v. State, 126 Fla. 464, 171 So. 241, when considering a premeditated design to kill or take human life, said:

"Murder in the first degree is defined in this State by Section 7137, C. G. L., 1927, to be: 'The unlawful killing of a human being, when perpetrated from a premeditated design to effect the death of the person killed or any human being, or when committed in the perpetration of or in the attempt to perpetrate any arson, rape, robbery or burglary, shall be murder in the first degree.' A premeditated design to take the life of the person killed or any human being is an essential element of the crime of murder in the first degree. The fact of premeditation may be established by circumstances as any other fact and must exist an appreciable length of time before the killing so that the perpetrator of the act may know and be conscious of the nature and character of the act which he is about to commit and the probable result therefrom in so far as the life of the assaulted person is involved. See Yates v. State, 26 Fla. 484, 7 South. Rep. 880; Robinson v. State, 69 Fla. 521, 68 South. Rep. 649; L. R. A. 1915E 1215, Ann. Cas. 1917D 506.

"Premeditation has been defined by this Court to mean intent before the act, but not necessarily existing any extended time theretofore (Ernest v. State, 20 Fla. 383; Lowe v. State, 90 Fla. 255, 105 South. Rep. 829), holding that the intent to kill may enter the mind of the killer at a moment before the act. Savage v. State, 18 Fla. 909; Barnhill v. State, 56 Fla. 16, 48 South. Rep. 251; Carter v. State, 22 Fla. 553; Buchanan v. State, 95 Fla. 301, 116 South. Rep. 275; Rhodes v. State, 104 Fla. 520, 140 South. Rep. 309; Wooten v. State, 104 Fla. 597, 140 South. Rep. 474.

"The substance of the holding in these cases upon the subject of premeditation as an element in the offense of

murder is that if the purpose or intention to kill is definitely framed in the mind of the killer and he proceeds to act in the execution of such thought or design, the element of premeditation exists. It is not a question of how long the definite design or purpose to kill has been entertained by the killer. It is only sufficient that the evidence adduced shows to the exclusion of a reasonable doubt that the purpose to kill was definitely formed and definitely acted upon an appreciable length of time prior to the commission of the act which resulted in the taking of human life."

All courts in this State shall be open, so that every person for any injury done him in his lands, goods, person or reputation shall have a remedy, by due course of law, and right and justice shall be administered without sale, denial or delay. Section 4 of the Declaration of Rights of the Constitution of Florida.

The case here should be submitted to another jury. The judgment appealed from is reversed and a new trial awarded.

BROWN, J., concurs.