189 So.2d 617 (1966)
Frederick Keith CALLOWAY, Appellant,
v.
The STATE of Florida, Appellee.
No. 34234.
Supreme Court of Florida.
July 13, 1966.
Rehearing Denied September 20, 1966.
*618 J. Leonard Fleet, of Fuer, Fleet & Abram, Hollywood, for appellant.
Earl Faircloth, Atty. Gen., and James G. Mahorner, Asst. Atty. Gen., for appellee.
THOMAS, Justice.
The appellant, Frederick Keith Calloway, was found guilty of murder in the first degree and since there was no recommendation of mercy he was sentenced to death by electrocution.
Five points of error, including one that the evidence was insufficient to support the verdict, are now presented. We shall resolve all of them.
Before the trial on the merits commenced the judge conducted a hearing on a motion to suppress a purported confession and all evidence pertaining to it on the ground that it was extorted, and to suppress all information obtained from the defendant prior to the time he was represented by counsel.
At the hearing on the motion to suppress the first witness called was the defendant, himself, counsel informing the court that he was introduced "solely" for this purpose.
Considerable testimony was then adduced from the defendant-suspect about his treatment by a group of officers who had taken him in custody soon after the homicide was discovered. He claimed he was driven around the city by them, stopping on one occasion at the scene of the crime, then taken to the county jail where the questioning continued and he was stripped of all his clothing and made to spend the night in a cell bare of all bedding save a mattress. Continuing, he related how he was induced to re-enact the crime while motion pictures were taken of his performance. We gather from his statement that he acquiesced in this activity and did not actually protest although he says that from the outset of his association with the deputies, numbering as many as eight, he requested an attorney which was refused. Furthermore, he says he was repeatedly told that cooperation with them would result in eventual leniency in the imposition of sentence for the crime of murder, which he was told they knew he had committed, so he would be enabled to escape the death penalty. He said he did not believe he asked for an attorney on the morning of the re-enactment and did not make such a request during the re-enactment. He claimed that during the interrogation by the officers and while the confession was being recorded he was prompted by one of the detectives and replied accordingly in the expectation that by doing so his life would be spared.
The inquiry then turned to a description of the gun that had been used and he identified the weapon as an H & R Arms Company 22 calibre 9 shot blue steel revolver. The weapon was located at the home of the defendant's father following, according to one of the investigators, directions given by the defendant. The officers insisted that he was given every opportunity to call counsel and declined.
In sum, the preliminary investigation covered exhaustively the obtaining of the weapon, the giving of the confession and the re-enactment of the criminal act.
The officers who testified categorically denied any promises of reward or threats of harm in order to induce the confession and there was no testimony, even from the defendant, that they indulged in any form of brutality.
*619 This hearing of the motion to suppress was held 29 December 1964, three months after the slaying.
The judge finally denied the motion to suppress.
At the trial on the merits about two weeks later, it appeared from a colloquy between the judge and counsel for the defendant that the judge was ruling that the defendant did not have the right to present before the jury "evidence independent of his side of the case in opposition to the evidence [by the State] as to its [the confession's] voluntary character." It was apparently the judge's view that "we could reopen the hearing on the motion to suppress * * * out of the presence of the jury" to receive any newly discovered evidence. He seemed to have opined that the defendant could call witnesses relative to the taking of testimony only after the State had concluded its case. He seemed to entertain the thought that he would only allow testimony on admissibility supplementing that received on the hearing of the motion to suppress. He indicated that, having ruled on the motion to suppress, there was no right in the defendant to repeat the testimony in the presence of the jury. When these expressions are lifted out of context, they seem to have confused the situation largely due to a consideration at once of the procedure already followed with reference to the motion to suppress and the procedure to be followed relative to admissibility or inadmissibility of the confessions in the impending trial. At first we were puzzled by what resembled a deviation from the course long since charted by this court in the consideration of confessions.
As early as 1919 in Bates v. State, 78 Fla. 672, 84 So. 373, we held that once the judge, after hearing evidence surrounding the obtaining of the confession, determined the confession was admissible the defendant was entitled to have the evidence reintroduced before the jury, not that the jury be given the opportunity to pass upon its admissibility but that they could consider it in determining the weight that should be attributed to it. As late as 1956, in Graham v. State, 91 So.2d 662, we reiterated the principle stating that when the judge had conducted a hearing relative to the manner in which a confession had been obtained and held it admissible, the defendant had the right to have the testimony repeated before the jury that that body might consider it in determining the weight which should be accorded it. As applied to this case the inquiry into the circumstances surrounding the confession should have been utterly independent of the hearing on the motion to suppress. Thus, to repeat, the judge should have made a direct ruling on the admissibility of the confessions based on testimony heard in the absence of the jury, then upon ruling that the confessions were free and voluntary he should have caused all of the testimony to be repeated in the hearing of the jury that it could be appraised by that body.
After considerable study of the rather voluminous record we have concluded that in effect that was accomplished even though the process was not as clear as it could have been by strict adherence to the cases just cited.
The second question forms a challenge to the way in which the bullets taken from the victim's head were traced from their removal by the surgeon to the time of their introduction into evidence. The surgeon who first observed the victim at the death scene later performed an autopsy and removed four missiles from their positions in or near the brain. He gave a detailed description of each of the places where fragments were lodged. He recovered four missiles any one of which, he stated, would cause death. A deputy sheriff who witnessed the autopsy took the shell fragments to one Ed Bigler, a well qualified "fire arms examiner" employed at the Dade County Laboratory, who testified that he received the objects from the deputy in a plastic container to which a laboratory number was *620 affixed, and that the same number was put on each bullet followed by the letters A, B, C and D respectively. We find no fault with the manner in which the missiles were identified from the moment of their discovery by the surgeon to their presentation before the jury.
The next question, numbered three, raises the propriety of admitting in evidence a picture of the head of the deceased showing four wounds. The photograph was not taken at the scene where the victim's body was discovered but at the morgue. There seems to have been abundant evidence of the location and nature of the wounds and the identity of the deceased was thoroughly established.
Twenty-five years ago we recognized the value of photographs as evidence of scenes and the importance of an inquiry by the court into the question whether objects depicted were in the same position as when the crime was discovered. We held that the introduction of a picture of the body of a murdered person and the place where the murder was committed was relevant and that the appellant could not complain of the shocking nature of the picture on the sole ground of its gruesomeness inasmuch as the scene was one he created. But the primary thought was that the evidence was relevant and it was decided that this relevancy would not be overcome or counteracted simply because, incidentally, the scene was revolting as well as informative. Mardorff v. State, 143 Fla. 64, 196 So. 625.
We have treated of the subject many times since Mardorff. In Leach v. State, Fla., 132 So.2d 329, we approved the admission in evidence of the picture of a victim of homicide although he had been moved to a cot and we reiterated the rule that if otherwise relevant such pictures will not be rejected "merely because they tend to prejudice the jury." Again, in Reddish v. State, Fla., 167 So.2d 858, we considered the subject and held that ordinarily photographs "normally classed as gruesome" of bodies that have been removed from the scene of death, should not be admitted unless they have some "particular relevance" to the offense. The State concedes that this opinion offers some comfort to the appellant.
We do not think, however, that the picture submitted in this record is so ghastly as to overcome its value as evidence. True, the identity of the dead man was established and, in fact, was not even questioned, that the position and effect of the wounds were described by witnesses yet the pictorial proof while it could not be said to be indispensable was not purely cumulative and did have evidentiary value. It was not exceedingly gruesome, though somewhat unlovely. Dyken v. State, 89 So.2d 866.
The appellant complains about the procedure employed in determining the qualification of the jurors called to sit on the case. Evidently the judge first examined the jurors in attendance en masse about any hardship that they would undergo because of service on the trial jury. Then he inquired whether or not any of them had conscientious scruples about finding a verdict of guilty which would result in the infliction of capital punishment. It is specified in Sec. 932.20, Florida Statutes, F.S.A., that "[n]o person whose opinions are such as to preclude him from finding any defendant guilty of an offense punishable with death shall be allowed to serve as a juror on the trial of any capital case."
Clearly it was the duty of the trial judge to determine this fact and to rule upon it and, in the light of practicalities, to do so as early as possible. The appellant challenges the procedure insisting that he should have been permitted to examine the jurors individually, nonetheless. He bases his position on Sec. 913.02, Florida Statutes, F.S.A., or the last sentence of it, providing generally that the court may examine the jurors individually or collectively, and providing especially that counsel shall be permitted to propound pertinent questions "to the juror after such examination by the court." *621 To accept the argument of the appellant would be to emphasize form and ignore substance and practicality.
The trial judge has, and should have, wide latitude in excusing jurors because of sacrifice that would result from service on the jury and he has a duty, as we have said, to excuse a juror from service in a capital case, if the juror represents that he could not find a verdict of guilty knowing that it would result, his fellows agreeing, in imposition of the death penalty. We find no error in the procedure followed by the judge with reference to excusing at the outset jurors who because of hardship should not be required to serve and jurors who because of scruples could not.
The final question is a blanket assault on the sufficiency of the evidence to sustain the conviction of the appellant. We have scrutinized the record in this case not only because of appellant's challenge but also because of the obligation imposed on this court by Sec. 924.32(2) of the Florida Statutes, F.S.A. The homicide was plainly premeditated and, we might add, senseless. The appellant drove to a store where the victim 18 years of age was working. He called the youth out to his car and at gun point demanded the currency in the place. The boy obliged by producing $120. and when he did so the appellant ordered him into the car, took him to a relatively secluded spot and told him to lie down, whereupon he put four bullets into the youngster's head. The only motive for the cruel act was given by a woman with whom appellant had an illicit relationship. She quoted him as saying "I don't like eyewitnesses."
Woven into appellant's argument though not specified in any of his questions is a complaint about the introduction of pictures taken of him while re-enacting the crime. As to this point, it seems to have been settled contrary to appellant's contention by the opinion in Grant v. State, 171 So.2d 361, to which, incidentally, this writer dissented.
As a finale to this sordid story it should be recorded that the appellant in his vile and clumsy way was stealing the money to spend on the woman, one Ruth Mae Dunworth, and her offspring, that she reported him to the sheriff and later claimed the reward for betraying him.
The appellant was justly convicted and the judgment is 
Affirmed.
ROBERTS, DREW, O'CONNELL, CALDWELL and ERVIN, JJ., concur.
THORNAL, C.J., dissents with opinion.
THORNAL, Chief Justice (dissenting):
I think that the procedure followed in admitting the confession was erroneous. I would still disapprove the re-enactment of the crime, and in my view the photographs of the dead body were irrelevant and should not have been allowed into evidence. I would grant a new trial.