221 So.2d 192 (1969)
James Floyd ALBRITTON, Appellant,
v.
STATE of Florida, Appellee.
No. 68-397.
District Court of Appeal of Florida. Second District.
April 11, 1969.
Walter R. Talley, Public Defender, Bradenton, for appellant.
Earl Faircloth, Atty. Gen., Tallahassee, and William D. Roth, Asst. Atty. Gen., Lakeland, for appellee.
PIERCE, Acting Chief Judge.
This is a case wherein appellant James Floyd Albritton, defendant below, appeals *193 from a judgment of conviction and a sentence to 25 years in the State Prison upon a verdict of guilty returned by the jury after trial upon an information charging second degree murder in the Sarasota County Circuit Court.
The sole contention of substance here has to do with admission into evidence, over objection, of certain photographs, both in color and in black and white, of an infant girl child, Stacia Lynn Phillips, also variously referred to in the record as Stacie or Stacy, but hereinafter as Stacie. At the time of the child's death her mother, Michele Phillips, was living with defendant Albritton, having "moved in" with him at his Clark road home two weeks previously. Michele was not working. Albritton's work was training horses. Stacie was sixteen months old at the time of her death on July 12, 1967, and had been living at the house with her mother and Albritton during the two weeks interval.
The State's contention at trial was that Stacie's death resulted from persistent and brutal beatings and other physical abuse administered to the child by Albritton during the two weeks period. Numerous witnesses for the State gave eye witness accounts of such ill treatments, as shown by the record here, some of which may be here narrated:
He beat her with sticks. He beat her with a rope between her legs. He beat her with fresh switches, on one occasion a foot and a half long, and on another occasion 2 1/2-3 feet long. "He picked her up and whipped her with [such a switch] and let her just drop to the ground". He "whipped her across the stomach and across the back, leaving big welts". On one occasion in the presence of Michele and a mutual friend he "bit the baby", closing his mouth in the process, "and then he bit her on the shoulder and picked her almost off the floor * * * with his teeth".
Another witness saw the baby with "two very large blue hand prints in the middle of her back" with "nothing else on but a dirty diaper". And on another occasion "the baby was bruised around the face, on the right shoulder and on the arm" with "two burns on her finger", * * * "about half the finger was burned".
One witness said: "its face on one occasion was very bruised and beaten * * * and it was kind of mushy around the face. The whole side of it here was blue and you could touch it like this and it was very soft". Another witness said that on one occasion Stacie "was all bruised on her face, and she had a burn, it looked like a cigarette burn". He testified that Albritton admitted beating her with a ping-pong paddle and his belt on her bare rear end. "Stacie could hardly walk".
Another witness testified that about a week before Stacie died, "her arms and shoulders were both all bruised" and "she had a big bump on her head and her little buttocks was all bruised and she had several burns on her fingers" and she was "just crawling around". Another witness, who with his wife saw Stacie on Monday, just two days before she died, said that "the child was just not hardly able to move. She whined and we gave her a little water. And also Sunday she couldn't even hold, we had lemonade, see we had taken our lunch out there and we had lemonade and she noticed it and wanted it and she just grabbed it up and shook it, and couldn't even get it to her mouth".
An uncle of defendant Albritton, Robert Altman, was living with Albritton at the Clark road home before Michele moved in and continued living there thereafter. He testified he asked Michele, the mother, "to take the baby from the house and leave", and that he also reported the whippings of the child to deputy sheriff Blackburn in Sarasota, a friend of his, and "asked him would he come and look at the baby and see if something could be done about it". Before the wheels of the law could get into motion the child was taken hurriedly in an unconscious condition to the hospital.
*194 She was first examined by a neurological surgeon, Dr. Sullivan, in the emergency room. She then displayed "numerous bruises over head, chest, extremities, abdomen, pelvis, peritoneum, and numerous abrasions of the thorax and abdomen, abrasions and burns of the buttocks". He described her condition generally from a medical standpoint as a "battered child syndrome * * * evidence of a child having severe beating * * * multiple severe beatings." The child was admitted to the intensive care unit of the hospital and shortly thereafter underwent surgery where there was found "extensive injury to the brain". The bruises found on the brain were "just practically innumerable" and were "the immediate cause of death", which occurred shortly after surgery.
Dr. Forest Chapman, Medical Examiner for Sarasota County, examined Stacie's body at the hospital shortly after death and observed "quite a number of bruised areas over the body from head to toe. Starting at the head the child had large areas of bruising and swelling about the head, scars from the bridge of the nose extending to the side, the cheek, left cheek, more up in the zygoma region extending up into the temporal region, extending around to the back of the head, back of the head had bruised areas here. Lower, the base of the skull there were large bruised areas. There were large bruised areas over the face of the child, the lower lip * * * They also had bruising across the back, the chest, two distinct peculiar bruises in some areas of the skin also broken, what we call bilinear streaks, I guess an inch apart, coming from the left shoulder down to the right hip, across the back. Also similar marks to the right chest wall and a similar type injury across the front of the chest. The child also had a bruise about two inches in diameter, about an inch in diameter the lower part of the breast bone. Also had a bruise in the abdomen in front about the level of the navel. Also had a bruise, let me just say scattered smaller bruises about the lower legs, both sides. The child's entire, what we call perineum, the area of the child's privates as well as the buttocks and the back was literally a total mass of bruises and ecchymoses, black and blue areas * * * By some type trauma there was a break in the skin. As an example, slight lacerations on the inside of the lower leg. There was an area of the lower leg on the right where the skin had been broken. There was a large defect in the skin and the lower quadrant, let's say adjacent to the navel on the right, a large area, approximately one by one-and-a-half or two inches and longer diameter, extending down as deep as a subcutaneous fat. This was quite deep".
Dr. John S. Bracken, a local pathologist, performed an autopsy on Stacie's body, the result of which conformed with the visual evidence of the other doctors, including an experiment that determined the burns on the left buttock to have been caused by the burned tip of a cigarette.
The child's mother, Michele Phillips, who had married defendant Albritton between the time of Stacie's death and the date of trial, testified that Stacie "had bruises on the inside of her legs from horseback riding" on Monday, July 10, 1967, two days before she died. She stated that she "had her [Stacie] riding in front of me on the front part of the saddle and her legs, the saddle, the front of it came around in a curve and she was sitting with her legs about half on, the best she could sit, to where she was comfortable so it wouldn't spread her legs, so it wouldn't hurt her". She said it was "a Western saddle * * * high in the back, comes up in the front, rounded off, they've got a saddle horn, some of it curves around, built up, curves around". That was her explanation for injuries to Stacie's buttocks and the inside of her legs.
As to other marks and bruises on the child's body, Michele testified that Stacie, on the day she was taken to the hospital, "had fallen, she had climbed up on the shelves * * * in the diningroom * * * there were four or five shelves built straight up against the wall, all of them even and *195 that's where we had the telephone and small odds and ends". She also stated that Stacie "had a burn on her side * * * from my hair drier", which she had inadvertently left on her bed "to cover a wet spot". To explain the burns on the fingers, she testified that Stacie "picked up a cigarette * * * nothing happened that first time when she picked it up. Later on, a couple days later, I don't remember exactly when it was, she grabbed it with her fingers like that, it slipped and she caught the lit end of it and it burned her fingers". The foregoing are representative samples of the explanations of Stacie's mother for the many serious injuries on her body at the time of death.
Defendant Albritton also testified in his own behalf. He said that on July 3rd, 1967, in Arcadia at a "Quarter Horse Show" he was there "to do a bunch of horses" for "different people". He had left Stacie in a truck while he was "shoeing" a horse just behind the truck. Someone yelled to him that Stacie was on the ground where she must have fallen out, "she had a light blue mark here and across the back of her neck". On another occasion he returned from work and Stacie "had a burn, the best I can remember on her right side and one behind, I don't know which side, had a light blue mark on it". He was not at home when it happened but Michele informed him it was the result of the "hair drier" episode. He stated he struck Stacie only very lightly during the two weeks before her death, "just little minor things around the house, like frying pans on the stove, bowls on the shelves. That's about it around the house."
He stated on another occasion he "had cut a little whittling stick and was whittling on it" and Stacie wandered off in the palmettoes * * * "and I spanked her for it," using only the "little whittling stick" about one foot long. He denied that he ever tied Stacie up with a rope. He said that just before Stacie was taken to the hospital he had sat down to eat some pig ribs "and tried to get Stacie to eat a piece of it and she wouldn't. She walked back up in the kitchen. I was in the living room. The next thing I knew, I heard something falling and got up and went in there and found Stacie * * * Michele was with her. She hadn't carried her off the floor yet and I went ahead and picked her up and she was unconscious". That was the occasion when Stacie supposedly fell from the shelves.
On cross examination Albritton made blanket denial of practically all physical abuses previously testified to by the various State witnesses. He denied he ever beat Stacie; denied he ever whipped her; denied he ever dropped her; denied he ever kicked her across the room or telling anyone else he had done so; denied biting her on the hand, or biting her on the shoulder; denied ever tying her with a rope on any occasion; denied ever taking a rope between her legs and jerking her several times so she would fall down on her head; denied he ever beat her with a ping pong paddle; denied beating her with a belt; and denied ever burning her. He stated "the burns on her stomach, on her buttocks," apparently stemmed from the hair dryer and the burns on her two fingers happened "where she snatched a cigarette out of my right hand when I was sitting at the table one night. That's the only burns I know of."
He denied ever telling the witness Carol Thomas that he "had beaten [Stacie] for about three hours because she kept going to the bedroom instead of the shower". When asked if Stacie had any marks on her, either large or small, besides the burns mentioned, he replied that she "had a few bruises on her head, light bruises or knot, whichever one you call it * * * the only thing on the baby at the time it went to the hospital was just a few bruises".
The foregoing constitutes only the panoramic highlights of an extensive record of evidence, but it is fairly representative of the factual picture.
In such setting of testimonial conflict between the numerous State witnesses on the one hand and Albritton and his wife Michele on the other, the admissibility of *196 the photographs of the child taken in the hospital comes into clear focus. And it is in such posture of evidence that the propriety of admission of the photographs must be judged.
The photographs, several in color and two in black and white, were taken by sheriff deputy Bohannen with a polaroid camera in the intensive care section of the Sarasota hospital shortly after surgery, with the child lying on a hospital crib. The photographs were admitted in evidence over objection and have been certified to this Court. They show the nude body of Stacie from various directions, front, side, and rear, three quarter lengths, half lengths, and head view.
The pictures were all in the nude and, needless to say, were exceedingly gruesome and forbidding. They showed intense and aggravated traumatic effects on the head, face and body of the sixteen month old infant. They showed bruises, blemises, abrasions, lacerations, contusions and discolorations on practically every segment of the little body. They showed the head and right side of the face in heavy surgical wrappings from the skull operation. The entire body also appeared to be distinctly swollen. The color pictures are especially sickening. It cannot be gainsaid or denied that the photographs of the victim were reasonably calculated to inflame and arouse to a high degree of feeling the mind of any otherwise impartial juror.
The fact that the photos were inflammatory and such as would arouse to passion is not alone sufficient to warrant their refusal in evidence. Gragg v. State, Fla.App. 1965, 177 So.2d 59; Cullaro v. State, Fla.App. 1957, 97 So.2d 40; Pleas v. State, Fla. 1966, 184 So.2d 647; Calloway v. State, Fla. 1966, 189 So.2d 617. But where admittedly gruesome and reasonably calculated to inflame the minds of the jurors, they can only be admissible by a showing of the prosecution that, not only are the pictures relevant, but also that they are demonstrably material in reconciling or tending to reconcile, some disputed fact in evidence directly pertinent to the charge being tried. Belger v. State, Fla.App. 1965, 171 So.2d 574; Calloway v. State, supra; Reddish v. State, Fla. 1964, 167 So.2d 858; Blake v. State, Fla. 1963, 156 So.2d 511; Brooks v. State, Fla. 1960, 117 So.2d 482; Dyken v. State, Fla. 1956, 89 So.2d 866.
The information against Albritton was for murder in the second degree and charged that he feloniously assaulted Stacie by acts imminently dangerous to her and evincing a depraved mind regardless of human life, and that "in furtherance of said assault" he "did strike, beat, bruise and wound" her, "thereby inflicting on and upon the head, body and limbs" of Stacie "mortal wounds and hurts of which" Stacie died. This was the ultimate issue to be decided by the jury.
If the wounds, bruises and burns on her body, as she lay in the hospital just before her death, were many and aggravated, such as would result from beatings and other physical mistreatment at the hands of Albritton, the charge of second degree murder was made out. If, on the other hand, the bruises, etc., were relatively minor and slight, such as might result from a fall a week before from a truck, or an indoor fall from some wall shelving, or burns from a hair dryer, essentially accidental in nature, the charge would not be made out. The location, extent, degree, and severity of the bruises and burns would have a direct bearing in resolving the issue. The pictures were admitted in evidence and were taken by the jury into the jury room.
We have examined the pictures here and they could not have failed to exert a weighty influence on the jury in determination of the vital issue of the source and cause of the injuries. The pictorial evidence of the many and extensive bruises, burns and wounds all over the body bore mute, but conclusive, evidence of the fact of criminal brutality. It would indeed take a strong stomach to complete the process of examining all the pictures.
*197 Admittedly they were gruesome. Admittedly they were inflammatory. Admittedly they were revolting. But defendant Albritton is in a poor position to complain because his own acts produced the physical conditions which the pictures portrayed, which in turn produced the inevitable effect of prejudice in the minds of the viewers. They were not only relevant, but they provided demonstrable visual evidence to the jury of the extent and severity of the child's injuries, indicating strongly their cause and source.
But let us pause to emphasize one thing: if the pictures had not had such a direct bearing upon this most vital issue in the case, in addition to being merely relevant, we would have no hesitation in reversing the conviction. This is so because, while the inflammatory character of pictorial evidence is not sufficient of itself to warrant rejection as evidence, yet where such exhibits though technically relevant throw no light in resolving a material issue of fact, it lacks the necessary evidentiary prerequisite to warrant admission.
We think the sound and logical rule for admissibility is that if the pictorial evidence is not so inflammatory or gruesome as reasonably to prejudice the minds of the jury, the evidence is admissible provided it is relevant to any issue. But if such exhibit is so inflammatory and repulsive as would reasonably produce a prejudicial and exceedingly harmful effect on an otherwise impartial mind, it would not be admissible unless it would throw light upon a vital issue in the case and resolve, or reasonably tend to resolve, a conflict in evidence upon such vital issue.
Two cases, one from the Supreme Court and one from this 2nd District Court, support this rule. In Kitchen v. State, Fla. 1956, 89 So.2d 667, the Supreme Court said:
"The final contention of appellant is that the trial court erred in admitting certain photographs in evidence. Two of the photographs depict the scene of the crime and their relevancy and lack of inflammatory character render it unnecessary to discuss them further. The third photograph, however, is a picture of the body of the decedent taken at a funeral parlor, clearly showing the stab wound from which she died. It is our opinion that this photograph is not inflammatory in character, and could not adversely have affected the jury, but in any case it appears to be relevant to one of the issues involved herein. It shows a neat and skillful stab wound inflicted directly over the heart of decedent. Appellant had pleaded self-defense, and testified that the decedent had assaulted her, hitting her with a hammer, whereupon she struck decedent with a knife while running out of the room, and this act was in self-defense and with no intent to kill. The character and location of the wounds, clearly shown by the disputed photograph, tend to impeach appellant's version of the affray. While possible, it is improbable that the wound shown could have been inflicted under the circumstances which appellant's testimony described.
Where a photograph is otherwise properly admitted, it is not a valid objection that it tends to prejudice the jury, Mardorff v. State, 143 Fla. 64, 196 So. 625." (Emphasis supplied).
Dillen v. State, Fla.App. 1967, 202 So.2d 904, was a case in this Court factually similar to the instant case. We quote from the opinion on page 906:
"The state, in its information for second degree murder, charged that the appellant `* * * did unlawfully and feloniously make an assault on one Dawn Thivener with a deadly weapon, to-wit: his hands and fists, and in furtherance of said assault the said Ronald Emerson Dillen did strike, beat, bruise and wound the said Dawn Thivener, thus and thereby inflicting on and upon the head, body and limbs of her, the said Dawn Thivener, mortal wounds and hurts. * * *' At the trial there was conflict as to the *198 manner in which the injuries were inflicted. The state asserted that the injuries resulting in death were caused by physical abuse, whereas the defendant claimed he slapped the child on the back in an attempt to get the child to resume breathing. It was not enough for the state to show that death resulted from force applied to the back of the child; but the state, in order to prove its case, also had to show that the death resulted from physical abuse of the child. Clearly, photographs portraying such abuse were relevant to prove the nature and cause of the injuries resulting in death. See Kitchen v. State, supra." (Emphasis supplied).
The challenged photographs in the instant case were properly admitted within the limitations hereinbefore delineated, and the other errors assigned are clearly without merit. So the judgment appealed from is 
Affirmed.
MANN and McNULTY, JJ., concur.